UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>CHRISTOPHER MITCHELL,<br><br>            Defendant. | Case No. 23-CR-176 (JMC) |

**MEMORANDUM OPINION**

Defendant Christopher Mitchell is charged in a six-count indictment alleging unlawful possession of a firearm and unlawful possession with intent to distribute marijuana and amphetamine. ECF 1. These counts arise from evidence seized from Mitchell's person and from his mother's Acura SUV on April 20, 2023. Pending before the Court is Mitchell's Motion to Suppress the evidence and statements from that day. ECF 15. The Court has considered the Parties' arguments in their briefs as well as testimony and argument from multiple hearings on the motion, and the Court now rules that the motion is **GRANTED IN PART** and **DENIED IN PART** for the reasons set out in this Memorandum Opinion.[1]

**I.    BACKGROUND**

The Court finds the following facts primarily from the body worn camera footage relevant to Defendant's motion. *See* Gov't Ex. 1, Gov't Ex. 2, Gov't Ex. 3. On April 20, 2023, at approximately 1:10 PM, Mountain Bike Tactical Unit Officers Cory Brattain, Ivens Thermidor,

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

and Ruben Reynoso of the Metropolitan Police Department (MPD) approached a group of men gathered near a townhouse on the 800 block of 6th Street NW in Washington, D.C. Gov't Ex. 1 at 13:08:55–13:09:30.[2] A black plastic bag was hanging on a fence around the property where the men were gathered. *Id.* at 13:09:21. Officer Thermidor asked one of the men if the bag belonged to him, or if the bag was trash, and the man responded by denying ownership, picking the bag off the fence, and tossing it in a nearby public trashcan. Gov't Ex. 2 at 13:09:40–13:10:22. As the man walked away, denying ownership once again, Officer Brattain went to the trash can and picked up the bag to inspect its contents, which included what Officer Brattain thought may have been an unlawful quantity of marijuana,[3] a digital scale, empty plastic baggies, and a key fob to a car. Gov't Ex. 1 at 13:10:15–13:10:57; 13:12:30–13:12:45; ECF 19 at 23. The officers did not pursue, detain, or further question the man who left the bag, despite Officer Brattain suggesting, "[let's] see if we can't stop him." Gov't Ex. 1 at 13:11:15–13:11:30.

Moments after investigating the contents of the bag, the officers discovered that the car key in the bag was connected to an Acura SUV, which beeped when Officer Brattain pressed a button on the key fob, and which was parked on the same block and same side of the street just a few steps away. *Id.* at 13:11:00–13:11:20. While Officer Brattain called a supervisor to describe the scene and inquire about the possibility of "getting a dog out [t]here" to investigate, *id.* at 13:12:55–13:13:10, all three officers gathered near the SUV, and Officer Reynoso ran a search on the license plates that confirmed the vehicle was not stolen. *Id.* at 13:13:40–13:13:50; 13:15:14–13:15:25; 13:16:11–13:16:26. Between the conversations about the abandoned bag, the vehicle, and the men

---

[2] The pincites for the video exhibits refer to the timestamp (in Eastern Time) embedded in the upper right-hand corner of the footage.
[3] Under D.C. law, the limit for lawful marijuana possession is 2 ounces. D.C. Code § 48-904.01(a)(1)(A). Officer Brattain testified that he thought the amount in the bag "looked about over 2 ounces," but he could not "determine if it was 2 right there" without weighing it. Hearing Tr. at 65:22–66:3, July 21, 2023. The bag was later found to have contained 118.7 grams (4.19 ounces) of marijuana. ECF 19 at 23.

2

standing in the area, Officer Reynoso stood in the street to look into the driver side of the car for a moment but turned away as oncoming traffic drove by. *Id.* at 13:14:43–13:14:51. Officer Brattain took a longer look into the passenger side while standing on the sidewalk. *Id.* at 13:15:46–13:16:02; 13:16:40–13:16:46.

At 1:16 PM, within seconds of Officer Brattain observing, "whoever is in possession of this car is in possession of this weed because there's keys in the bag," Mitchell approached the officers to claim the car key. Gov't Ex. 1 at 13:16:30–13:16:42. Officer Thermidor greeted Mitchell and asked whether the car belonged to him, and Mitchell explained that he does not have a driver's license, but that the car belongs to his mother, who worked just down the street, and Mitchell could call her. Gov't Ex. 2 at 13:16:42–13:16:55. The officers told Mitchell that the key was found in a bag with marijuana and asked Mitchell multiple times if the other items in the bag (i.e., the marijuana, scale, and baggies) were his, which he denied, at one point showing the officers his personal stash of marijuana to explain that he "know[s] what [he] can carry." *Id.* at 13:16:55–13:17:50; Gov't Ex. 1 at 13:18:00–13:18:59. After Officer Thermidor told Mitchell that the officers needed identification before releasing the key to anyone, Mitchell took out his phone, called his mother, told her that she needed to come to the scene, and then walked to the corner away from the officers to finish the phone call. Gov't Ex. 1 at 13:19:00–13:21:15; *cf.* Gov't Ex. 9 (map of 6th St. NW and H St. NW). The officers did not instruct Mitchell to return or otherwise interrupt him as he walked away. Gov't Ex. 1 at 13:20:00–13:20:15.

At 1:21 PM, Mitchell returned to speak with Officer Brattain, who asked Mitchell his name, date of birth, contact information, and whether he had any warrants out. Gov't Ex. 1 at 13:21:15–13:23:05. Mitchell provided his personal information and stated that he had no warrants out for his arrest but was on probation for "felon-in-possession" of a firearm. *Id.* Officer Brattain then asked

3

multiple times if there were guns in the car, which Mitchell denied even after Officer Brattain implied that a canine unit could be brought down to sweep the car. *Id.* at 13:23:05–13:23:26 ("So if I got a dog out here to sniff it there's not going to be no gun?"). Officer Brattain then told Mitchell to "hang tight," Mitchell sat down on a high curb in front of the residence on the corner, and Officer Brattain walked away to speak on the phone with a supervisor. Gov't Ex. 2 at 13:23:25–13:23:30.

At 1:24 PM, Mitchell once again began walking away from officers and appeared to be on the phone, but this time Officer Brattain directed Officer Michael Davis (who had just arrived on mountain bike) to stop Mitchell. *Id.* at 13:24:10; Gov't Ex. 1 at 13:24:30 ("Hey, don't let him walk away!"); Gov't Ex. 1 at 13:25:20 ("He's stopped at this point."). At the same time, Officer Dominique Tyson arrived in his patrol car and approached Mitchell, who was seated and flanked by Officers Thermidor and Davis. Gov't Ex. 3 at 13:26:15. The officers asked Mitchell about the contents of the car, advised him that a canine sweep could prompt the officers to "search the car anyway," and encouraged him to consent to a search of the car. *Id.* at 13:27:20–13:28:25 ("If you're trying to go about your business . . . let the officers search the car."). Mitchell denied any wrongdoing, did not agree to a search, and reiterated that it was his mother's car. *Id.* Officer Tyson then walked over to look for "paraphernalia" in the vehicle, *id.* at 13:28:50–13:29:00; at this point Officer Brattain had only seen "big plastic bags" from his inspection of the passenger side. Gov't Ex. 1 at 13:27:50–13:28:05. Looking through the driver seat window, now with a patrol car blocking traffic while officers stood in the street, Officer Tyson identified "white rock" in "plain view" that looked like "Molly all on the . . . floor."[4] Gov't Ex. 3 at 13:29:00–13:29:20. Officers Reynoso, Tyson, and Brattain all looked into the driver seat window to confirm, and can be heard

---

[4] "Molly" or "Molly rock" refers to a type of unlawful amphetamine that has a white, crystal-like appearance. Hearing Tr. at 33:7–15, July 21, 2023 (testimony of Officer Brattain).

4

on tape describing what they saw as "white rock," "white crystal-like substance," and "emptied out Molly," which had "a baggie laying next to it." Gov't Ex. 1 at 13:29:50–13:31:30.

After observing the white rock in the SUV, Officer Tyson returned to Mitchell and asked if "all the Molly on the floorboards" belonged to him or his mother, which Mitchell denied, and then asked if he had drugs on him, which Mitchell also denied aside from the marijuana on his person. Gov't Ex. 3 at 13:30:43–13:31:50. Officer Tyson then instructed Mitchell to "stand up for me," asked again if he had drugs on him, and then asked: "I can check you for drugs real quick?" Gov't Ex. 2 at 13:31:55–13:32:10. Mitchell responded by outstretching his arms, Officer Tyson asked Mitchell to confirm he was "sure," Mitchell nodded his head "yeah," Officer Tyson said, "Yes? Alright," and began patting down Mitchell's pants. *Id.*; Gov't Ex. 3 at 13:31:55–13:32:10. The search initially uncovered $3,818.86 in cash and a baggie containing blue pills. ECF 19 at 10. Officers placed Mitchell in handcuffs while Officer Tyson told him multiple times that he was "not under arrest." Gov't Ex. 3 at 13:32:40–13:33:10. Officer Tyson also stated that he felt "Molly" near Mitchell's groin and told (now-handcuffed) Mitchell that he could either give it up or risk "an extra charge" if it were found "at the station," since the officers were "going to lock [him] up" regardless. *Id.* at 13:32:45–13:32:46, 13:33:25–13:33:45. Mitchell said he would turn over what Officer Tyson felt and took out another baggie, Gov't Ex. 3 at 13:34:00–13:34:47, which contained "the same substance consistent with what [officers] saw on the floorboard, the white crystal-like amphetamine." Hearing Tr. at 39:2–6, July 21, 2023 (testimony of Officer Brattain). While Mitchell remained handcuffed, a sixth officer arrived on scene in a patrol car, and Officers Thermidor and Tyson continued to question Mitchell about whether there were drugs or guns in the car, encouraging him again to consent to a search—Mitchell declined. Gov't Ex. 2 at 13:35:20–13:36:00; Gov't Ex. 3 at 13:36:22–13:37:05.

5

By 1:41 PM, Mitchell's mother arrived on scene and spoke with Officer Tyson, telling him that the car was just dirty (as to the white substance on the driver seat floor) and that she did not give them permission to search the car. Gov't Ex. 3 at 13:41:00–13:41:45. While looking over to the SUV where his mother was standing with Officer Tyson by the driver side, Mitchell stood up and walked towards the car saying, "give my momma her car, come on, give my momma her car." Gov't Ex. 2 at 13:41:20–13:41:32. Once he reached the car, Mitchell raised his voice while looking to his mother, telling her: "Take your car. Get your car. Get your car! Open the door." Gov't Ex. 1 at 13:41:30–13:41:39. While Mitchell was speaking to his mother, Officer Thermidor spoke over him, telling his fellow officers no less than six times that Mitchell was "working with [them]" and asking Mitchell to specify which door he should open. *Id.* at 13:41:30–13:42:00. Possibly confused, Officer Brattain asked, "what are we doing?" to which Officer Thermidor stated (again) that Mitchell was working with them as he opened the passenger side door. *Id.* at 13:41:45.

With a door to the SUV already opened, Officers Thermidor and Tyson asked Mitchell to direct them where to look in the car. *Id.* at 13:42:00. Following Mitchell's indications, Officer Thermidor pointed to the glove box and asked Mitchell "this one?" Gov't Ex. 2 at 13:42:10. The officers then discovered a gun in the glovebox, which prompted Officer Tyson and Mitchell to exchange words about his prior charges, and Mitchell instructed Officer Tyson to look in the backseat for additional firearms. Gov't Ex. 3 at 13:42:20 ("You got another gun? Aren't you on papers for a gun? Come on, man!"); *id.* at 13:43:45 ("That's not it, Tyson. . . . Backdoor, Tyson."). In total, the search of the car uncovered: three firearms, five bundles of white rock-like substance that tested positive for amphetamine (as did the white rock found on the driver side floorboards), five bags of suspected synthetic cannabinoids, three digital scales with white residue, and a jacket containing one-quarter of a bottle of suspected Promethazine. ECF 19 at 12–14.

Mitchell now moves to suppress all statements allegedly made during his encounter with the officers and all tangible evidence recovered as unlawful in violation of *Miranda* and the Fourth Amendment, respectively. ECF 15, ECF 26, ECF 29. The Government opposes the motion. ECF 19, ECF 27, ECF 31. The issue is fully briefed, and this Court heard argument from the Parties on July 21, 2023 and again (after supplemental briefing) on October 6, 2023.

## II.   LEGAL STANDARD

The Fourth Amendment protects individuals against "unreasonable searches and seizures" by law enforcement officials, U.S. Const. amend. IV, and "this protection extends to a brief investigatory stop [(i.e., a *Terry* stop)] of persons or vehicles, whether or not an arrest follows." *United States v. Bailey*, 622 F.3d 1, 5 (D.C. Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see Terry v. Ohio*, 392 U.S. 1, 9 (1968). Searches conducted without a warrant issued by a judge upon a showing of probable cause "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005) (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). For example, a warrantless search is permissible where an individual gives voluntary consent to a search. *United States v. Hall*, 969 F.2d 1102, 1106 (D.C. Cir. 1992) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). For searches of automobiles in particular, a warrant is unnecessary "if the officer has probable cause to believe that the vehicle contains contraband or an illegal weapon," *United States v. Kelly*, 267 F. Supp. 2d 5, 10 (D.D.C. 2003) (citing *Carroll v. United States*, 267 U.S. 132, 156 (1925)), which is all but certain when the vehicle contains an item "in plain view [whose] incriminating character . . . [is] immediately apparent," *Horton v. California*, 496 U.S. 128, 136 (1990).

The Fifth Amendment safeguards individuals' right against self-incrimination. U.S. Const. amend. V. To effectuate this guarantee, law enforcement officials may not subject individuals to custodial interrogation without first reading them their *Miranda* rights. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). A custodial interrogation consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. An "interrogation" is not limited to "express questioning," but also includes "words or actions on the part of the police that the police should know are reasonably likely to elicit incriminating answers." *United States v. Williamson*, 181 F. Supp. 3d 41, 43 (D.D.C. 2014) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Any un-*Mirandized* statements cannot be used for the prosecution's case in chief, but voluntary statements may nonetheless be used for impeachment purposes, and the "fruits" of a voluntary but un-*Mirandized* statement are still admissible. *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). The question of "voluntariness" hinges on a "careful evaluation of all the circumstances of the interrogation," *Mincey v. Arizona*, 437 U.S. 385, 401 (1978), including factors such as "the defendant's age and education, the length of the detention, whether the defendant was advised of his rights, and the nature of the questioning," *United States v. Murdock*, 667 F.3d 1302, 1305–06 (D.C. Cir. 2012) (citing *Schneckloth*, 412 U.S. at 226).

### III. ANALYSIS

Mitchell argues that the warrantless search of his person and the warrantless search of the Acura SUV were unlawful and therefore the evidence seized from those searches must be suppressed.[5] He contends that he was seized "from the moment he approached the officers," and

---

[5] The Parties do not dispute (or even question) whether Mitchell has standing to challenge the search of his mother's car. Lest there be any doubt, the Court is satisfied that he does. *See* ECF 19 at 14–15 (describing Mitchell's use of car); *cf. United States v. Savoy*, 889 F. Supp. 2d 78, 87 (D.D.C. 2012); *United States v. Williams-Davis*, No. 91-CR-0559-01, 1992 WL 26025, at *2 (D.D.C. Jan. 31, 1992).

8

that the investigative *Terry* stop went beyond what was reasonably necessary to investigate any suspicion particular to him. ECF 26 at 6–7. He further asserts that the unlawful stop nullifies any consent he may have given to search his person or the car and, in the alternative, that his consent was coerced. *Id.* at 13–14. The Government counters that Mitchell was not stopped until he was expressly ordered to remain on scene and that the ensuing eight-minute *Terry* stop constituted a reasonable amount of time to wait for the vehicle's owner to arrive while investigating Mitchell's possible drug distribution. ECF 27 at 4–6. The Government also disputes that Mitchell's consent was coerced and argues that the search of the car in particular was independently lawful under the automobile exception and inevitable discovery doctrine. *Id.* at 9, 11. With regard to his statements to officers, Mitchell argues that all his statements must be suppressed as unlawful under *Miranda*. ECF 15 at 4–6. The Government concedes, as it must, that Mitchell was in custody once he was put in handcuffs and that he was not read his *Miranda* rights. *See* ECF 19 at 32–33. However, the Government rejects the suggestion that Mitchell was subject to any custodial interrogation prior to that, and further asserts that the statements made after his arrest were "voluntary and thus admissible as impeachment evidence." *Id.*

After taking each of these issues in turn, the Court finds that both the search of Mitchell's person and the search of his mother's car were reasonable. The Court further finds that Mitchell was subject to a custodial interrogation after he was placed in handcuffs, that his statements were voluntary, and as such those statements must be excluded from the Government's case in chief but may be used for purposes of impeachment.

### A. The Search of Mitchell's Person was Lawful

The Court begins by addressing the Parties' dispute over when Mitchell was "seized" (i.e., stopped by the officers). A seizure can occur either "when physical force is used to restrain

9

movement or when a person submits to an officer's 'show of authority.'" *United States v. Brodie*, 742 F.3d 1058, 1061 (D.C. Cir. 2014) (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). "A show of authority sufficient to constitute a seizure occurs where the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). To determine whether or when an individual was seized, a court "consider[s] the totality of the circumstances," including the officers' conduct, the suspect's responses, and the overall context of the encounter. *Id.*

      The Court finds that Mitchell was not seized until 1:24 PM when Officer Brattain ordered him not to leave and another officer physically blocked his path, causing him to stop. Prior to that, Mitchell had not submitted to any show of authority. Mitchell voluntarily approached the officers and began speaking with them at 1:16 PM. The conversations between Mitchell and the officers maintained a casual and calm tone, Mitchell was not physically restrained, and the officers did not order Mitchell to stay when he walked away to speak on the phone. The fact that the officers were unwilling to give the car key to Mitchell—a person who, by his own admission, was not the owner of the car—did not turn this encounter into a detention. Additionally, even after Officer Brattain told Mitchell to "hang tight," which one could reasonably interpret as a formal instruction to stay on the scene, Mitchell did not clearly submit to that "show of authority" because he stood up and walked away shortly thereafter. To the extent Officer Brattain intended to stop Mitchell with that instruction, "[o]ne cannot submit to an order not to 'walk off' by walking off." *United States v. Veney*, 45 F.4th 403, 405 (D.C. Cir. 2022). Thus, Mitchell was detained only once Officer Davis pulled in front of him and other officers surrounded him at 1:24 PM. Eight minutes later, Mitchell

was placed in handcuffs and undisputedly under arrest (and lawfully so given the suspected illegal narcotics and cash found on his person). *See* ECF 27 at 7, 10.

With the timing of the *Terry* stop established, the Court now must determine whether this eight-minute detention was reasonably necessary to investigate (and proportional to) the officers' reasonable suspicion of Mitchell's criminal activity. Police may briefly detain a person where an officer has a "reasonable suspicion" that the person is about to engage or engaging in criminal activity. *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001). This detention must be "no longer than is necessary to effectuate the purpose of the stop," *United States v. Hutchinson*, 408 F.3d 796, 800 (D.C. Cir. 2005), and "a stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause," *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017). There is no "bright line" indicating when an investigative stop becomes an arrest, which is why it is critical for courts to consider the specific facts of each case and assess what was "reasonably needed" to investigate the objective, particularized suspicion of the detainee's criminal activity. *See id.*

The Court finds, and the Parties do not dispute, that the officers had an objective, reasonable, and particularized suspicion sufficient to justify some form of investigatory detention. *See* ECF 26 at 8; ECF 27 at 4. Mitchell, however, argues that any such suspicion should have been dispelled by the time Officer Brattain had asked a few questions and told Mitchell to "hang tight." ECF 26 at 7. The Court disagrees. If anything, Mitchell's encounter with officers increasingly raised suspicion about his possible criminal activity. From the start, Mitchell expressed interest in the Acura key fob and thus associated himself with the drugs and drug distribution paraphernalia found with that key fob. Mitchell himself did not purport to be the owner or the driver of the vehicle but instead stated that the lawful owner (his mother) was close by and could come to the

11

scene to clarify, providing a sensible basis to wait for that clarification. Mitchell then displayed a bag of marijuana to the officers that he had on his person, which could reasonably raise questions about whether Mitchell was connected to the marijuana, scales, and bags the officers found. And right before being told to "hang tight," Mitchell revealed that he was on probation for being a felon in possession of a firearm, thus indicating that he had at least two prior, possibly relevant criminal convictions. *See United States v. Castle*, 825 F.3d 625, 629 (D.C. Cir. 2016) ("[K]nowledge of an individual's criminal history can corroborate, but not substitute for objective indications of ongoing criminality."); *United States v. Payne*, 805 F.2d 1062, 1066 (D.C. Cir. 1986) (agreeing with "the overwhelming weight of authority from other circuits" that "recognize the connection between weapons and narcotics distribution"). Together, these circumstances established a clear, particular, and articulable suspicion that justified Mitchell's detention.[6]

Turning to the nature of the *Terry* stop itself, the Court does not find that Mitchell's detention was unduly prolonged or unduly intrusive. At a high level, since Mitchell represented that his mother was nearby, the Court agrees with the Government that it was reasonable for officers to ensure he remained on scene while waiting for the vehicle's lawful owner to arrive. *See Hall*, 867 F.3d at 157 ("An investigatory stop to maintain the status quo momentarily while obtaining more information would have been most reasonable in light of the facts known to [the officer] at the time."). Moreover, the officers' conduct does not reflect a failure to "diligently

---

[6] The Court pauses to emphasize a few important caveats as to the relevance of Mitchell's criminal record. First, knowledge of prior criminal conduct must be paired with "concrete factors to demonstrate that there is a reasonable suspicion of *current* criminal activity." *Castle*, 825 F.3d at 629. Second, the relevance of one's criminal record depends on how strong the nexus is between the prior misconduct and the present suspected misconduct. *See, e.g.*, *United States v. Hassanshahi*, 75 F. Supp. 3d 101, 120–22 (D.D.C. 2014) (prior investigation into defendant's conspiracy to violate Iran trade embargo "contribute[d] powerfully" to suspicion regarding attempt to violate Iran trade embargo (again) as evidenced by travel to Iran). In Mitchell's case, while his prior gun charge may have been somewhat relevant to his suspected drug distribution, its value is minimal. To state the obvious, the crimes are distinct. As such, particularly given the several other "concrete factors" that were far more indicative of drug distribution, Mitchell's criminal record plays only a minor supporting role in the Court's reasonable suspicion analysis. The Court's findings and conclusion in this case would be the same if Mitchell had no prior record.

pursue[]" their investigation. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985). After Mitchell was stopped, the officers again asked him whether there were guns or drugs inside the vehicle Mitchell had come to claim. A few minutes after Mitchell denied the presence of either, the officers looked inside the vehicle and found plastic baggies and white crystal-like rock that looked like (and in fact was) illegal amphetamine. This finding added objective support for the officers' suspicion that Mitchell was involved in drug distribution and, indeed, it was only after this discovery that an officer attempted to search Mitchell for drugs.

The Court acknowledges, but remains unpersuaded by, Mitchell's argument that he was subject to a *de facto* arrest before he was placed in handcuffs. To be sure, the Court shares Mitchell's concern that, with no indication that he was dangerous, it may have been excessive for law enforcement to surround him with "at least four officers and several police cars." ECF 26 at 11 (citing *United States v. Devaugh*, 422 F. Supp. 3d 104, 115 (D.D.C. 2019)). But this sole consideration in Mitchell's favor does not offset the many factors pointing the other way. Throughout the entire *Terry* stop, which lasted only eight minutes, the officers did not touch or handcuff Mitchell, they did not display weapons or threaten Mitchell, and they remained conversational and calm throughout. At bottom, the Court finds that the temporary investigatory stop of Mitchell was reasonable in scope and duration.

Having concluded that the *Terry* stop of Mitchell was lawful, the Court now assesses whether Mitchell gave voluntary consent to the search of his person and finds that he did. The issue of voluntariness "is a question of fact to be determined from all the circumstances," and this Court may consider Mitchell's "age, poor education or low intelligence, lack of advice concerning his constitutional rights, the length of any detention before consent was given, the repeated and prolonged nature of the questioning, and the use of physical punishment." *Hall*, 969 F.2d at 1107.

It is true that Mitchell was not advised of his constitutional rights, was encouraged to cooperate, and received an order to "stand up" right before he gave consent to a search. However, almost all other considerations about Mitchell himself and the circumstances that day support a finding of voluntariness: Mitchell was one week shy of 25 years old at the time, he had a high school education, he was detained only eight minutes, the officers' questioning was calm and conversational, no physical force was used, and the searching officer explicitly asked Mitchell if he was "sure" about the search before proceeding. And even though the officers did not tell Mitchell that he had a right to refuse, when they encouraged him to consent to a search of the car, Mitchell declined, which "suggest[s] that [he] knew something of [his] legal rights and that [he] had the capacity to resist police questioning." *Id.* at 1108. Moreover, this was not Mitchell's first encounter with law enforcement—far from it. *See* ECF 9 at 1 (Pretrial Services Report listing four prior convictions and fourteen arrests); *United States v. Hackely*, 636 F.2d 493, 499 (D.C. Cir. 1980) (considering "prior experience with the criminal justice system" as relevant to voluntariness).

Considering the surrounding circumstances in their totality, the Court is not persuaded that Mitchell's "will was overborne" by the officers' conduct. *Hall*, 969 F.2d at 1106. As such, the Court finds that Mitchell consented voluntarily to the search of his person, and because he did so during a lawful stop the evidence seized from his person is admissible. The Court now moves on to assess the reasonableness of the officers' search of the Acura SUV.

**B. The Search of the Vehicle was Lawful**

The Court first finds that Mitchell did not give effective consent to search the vehicle, primarily because it is unclear that Mitchell gave consent to search the vehicle *before* the officers initiated the search in the first place. At the critical moment when Mitchell stood up to approach

14

the vehicle and purportedly gave consent to the search, it is plain as day that he was addressing his mother and not the officers. Despite Mitchell's obvious attempt to speak to his mother, paying little to no attention to the officers, the footage suggests that Officer Thermidor nonetheless decided Mitchell had consented earlier, perhaps the very moment Mitchell stood up. By the time Officer Thermidor addressed Mitchell directly, the officer was already reaching for and grabbing the passenger door handle, asking only that Mitchell confirm that this was the best door to open. On top of the many objective indications that a search was already underway, the overall chaos and confusion of this encounter is all the more disconcerting. By the time Mitchell approached the car, he was handcuffed, surrounded by three officers, and attempting to communicate with his mother, all the while even the officers themselves did not seem to understand what Officer Thermidor meant by his repeated statements that Mitchell either was "going to work with [them]" or maybe already was "working with [them]." *See* Gov't Ex. 1 at 13:41:30–13:42:00 (Officer Brattain asking, "what are we doing?"). The Court cannot agree with the notion that the Fourth Amendment condones a "search first, get consent later" approach to law enforcement.

Regardless of whether Mitchell consented, however, the Court finds that there was probable cause to search the vehicle and thus the search was lawful under the automobile exception. Under this exception, officers may search a vehicle without a warrant if the car "is readily mobile and probable cause exists to believe it contains contraband." *United States v. Maynard*, 615 F.3d 544, 567 (D.C. Cir. 2010) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). Probable cause is defined as a "fair probability," *Illinois v. Gates*, 462 U.S. 213, 238 (1983), and is "an objective standard requiring an analysis of the totality of the circumstances and the facts known to the officers at the time of the search," *Jackson*, 415 F.3d at 91. Of the variety of factors that may prove relevant, an officer's discovery of contraband in plain view weighs

15

heavily in favor of probable cause. *United States v. Brown*, 334 F.3d 1161, 1173 (D.C. Cir. 2003). And once probable cause is established, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).

The officers who apprehended Mitchell on April 20, 2023, had probable cause to support their warrantless search of the vehicle based on evidence that the vehicle contained illegal drugs. The Court acknowledges that the officers appeared to be operating under the presumption that they had (and maybe needed) Mitchell's consent, but this "play[s] no role" in the probable cause analysis "as long as their actions were objectively reasonable." *United States v. Williams*, 878 F. Supp. 2d 190, 204 (D.D.C. 2012) (quoting *Jackson*, 415 F.3d at 91). Under this objective inquiry, the timeline of events largely speaks for itself: a car key connected to a nearby car is found with drugs and drug distribution materials, the individual who comes to claim the car key has marijuana on his person, white crystal-like rock that officers immediately (and ultimately correctly) identify as "Molly" is seen in plain view on the floorboard of the car next to a torn baggie, and similar white crystal-like rock is then found in a baggie hidden in the pants of the same individual who came to claim the car. *See United States v. Wider*, 951 F.2d 1283, 1286 (D.C. Cir. 1991) (discovery of drugs on individual can contribute to probability "that the[ir] [nearby] vehicle contain[s] additional evidence of drug dealing activity"). Taken together, these facts known to the officers established a "fair probability" that illegal drugs were in the car, which justified a search of any area within the car that could conceal illegal drugs, including the glovebox, seats, floorboards, and any bags therein. *See Ross*, 456 U.S. at 821 ("When a legitimate search is under way . . . nice distinctions . . . between glove compartments, upholstered seats, trunks, and wrapped packages, in

the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.").

Mitchell's principal opposition to the automobile exception is that the incriminating nature of the white rock on the driver seat floorboard was not "immediately apparent," *see Horton*, 496 U.S. at 136, and that "[m]ere assertions that officers can recognize something as contraband are not sufficient to establish probable cause," ECF 26 at 19, but his arguments miss the mark for at least three reasons. First, inasmuch as Mitchell points out that the officers "peered into the car multiple times[] from every angle" and failed to identify any illegal narcotics, ECF 26 at 8, Mitchell implicitly overstates the degree to which any officer investigated the driver side of the vehicle where the "Molly" was found. Prior to Officer Tyson's arrival, Officer Brattain had only looked through the passenger side of the car, and Officer Reynoso spent just a few seconds peering into the driver side. That is to say, it is unsurprising that no one discovered the small white rocks on the floorboards in front of the driver's seat until Officer Tyson took a closer look in that area.

Second, while the Court acknowledges Mitchell's argument that the white substance was not obviously incriminating because it was also consistent with his mother's "plausible alternative explanation" that the car contained "debris from a recent move," ECF 26 at 18, the Court nonetheless credits the officers' training and experience that influenced their belief that the substance was "Molly rock." *See* Hearing Tr. at 102:13–18. Probable cause must be evaluated in part "from the particular viewpoint of the officer[s] involved in the search," and officers tend to "reach conclusions based on their training and experience." *United States v. Prandy-Binett*, 995 F.2d 1069, 1071 (D.C. Cir. 1993). Along those lines, and as he even explained to Mitchell that day, Officer Tyson identified the substance as "Molly rock" because he "know[s] what drugs look like" after 18 years of experience as an officer. Gov't Ex. 3 at 13:31:00–13:31:10; Hearing Tr. at

17

125:4–12. The incriminating nature of the substance and the reasonableness of Officer Tyson's belief are further bolstered by the fact that he identified the "Molly rock" within 10 seconds of looking into the car and was audibly confident in his conclusion. *See* Gov't Ex. 3 at 13:29:00–13:29:21 (stating, "that's not ashes, that's Molly"). Officer Tyson was not alone in his belief either—the footage demonstrates that Officers Brattain and Reynoso reached the same conclusion contemporaneously and without hesitation. Gov't Ex. 1 at 13:29:55–13:30:20. While a layperson or even the Court may not have recognized the substance as unlawful amphetamine, the Court credits Officer Brattain's sworn testimony that he believed the substance to be just that. *E.g.*, Hearing Tr. at 34:21–24. On the current record, the Court finds no reason to think that these officers' belief, informed by years of training and experience, was not genuine or reasonable.

Finally, it is of no moment whether Officer Tyson's belief, "without more," was sufficient to establish probable cause, ECF 26 at 19, because, as the Court has already explained, a variety of other supporting facts established probable cause that the vehicle contained contraband. Although the officers did not have valid consent to search the Acura SUV, the search was still lawful under the automobile exception and therefore the evidence seized from the vehicle is admissible. As such, the Court need not address the Government's alternative argument under the inevitable discovery doctrine and will now turn to Mitchell's *Miranda*-based arguments.

C. **Mitchell's Statements After His Arrest Must be Suppressed**

Mitchell's request to suppress all of his statements made during his encounter with MPD officers is overbroad because many of his statements did not occur while he was in custody. "[T]emporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody," *Howes v. Fields*, 565 U.S. 499, 510 (2012), and thus the MPD officers on scene were not required to read Mitchell his rights until they placed him under arrest

at 1:32 PM. Of course, even after placing Mitchell under arrest, the officers failed to read him his rights before further questioning him (i.e., subjecting him to a custodial interrogation), and the Government appears to concede that, as a result, all of Mitchell's statements after his arrest must be suppressed. *See* ECF 19 at 34. To be precise, the Court finds that the officers arrested Mitchell at "13:32:40," as timestamped on Government Exhibit 3, when Officer Tyson instructed Mitchell to place his hands behind his back, directed another officer to handcuff Mitchell, and told Mitchell "you're not under arrest." The only issue remaining is whether Mitchell gave his statements voluntarily, which will determine whether the Government may nonetheless use them for impeachment purposes. *See Elstad*, 470 U.S. at 307.

The Court finds that Mitchell's statements were given voluntarily. Nothing in the footage indicates that Mitchell was subject to coercive physical force, psychological manipulation, misleading promises from officers, or anything else that would suggest that his statements were coerced. *See United States v. Watson*, 423 U.S. 411, 424 (1976). Rather, both his actions and words appeared to be the "product of an essentially free and unconstrained choice." *Murdock*, 667 F.3d at 1305. Even after being placed in handcuffs, Mitchell stood up on his own, walked over to the vehicle, and appeared to be speaking his mother first and the officers second. The officers undoubtedly questioned and spoke to Mitchell in a manner that was likely to elicit incriminating responses, but this only proves something the Government concedes and that this Court has already found: a custodial interrogation was underway. *See Williamson*, 181 F. Supp. 3d at 43. It does not establish, and the Court does not find, that Mitchell's statements were coerced. Consequently, his statements must be excluded from the Government's case in chief but may be used for impeachment purposes.

## IV.  CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendant's Motion to Suppress, ECF 15, only with regard to his statements after he was placed under arrest, and these statements may be used solely for impeachment purposes. In all other respects, the Court will **DENY** Defendant's Motion. A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: January 5, 2024